[No. D002442. Fourth Dist., Div. One. Mar. 21, 1986.]

In re BRENDAN P., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Plaintiff and Respondent, v.
BERNARD P., Defendant and Appellant.

---

**COUNSEL**

Starre & Cohn, Harold J. Cohn and Seth Kramer for Defendant and Appellant.

Edwin L. Miller, Jr., District Attorney, Peter C. Lehman and Edward J. Mantyla, Deputy District Attorneys, for Plaintiff and Respondent.

Minou Emami for Minor.

---

**OPINION**

**STANIFORTH, Acting P. J.—** At issue in this case is the juvenile court's jurisdiction to make a dependency finding under Welfare and Institutions Code section 300, subdivision (a), when the father had not received sufficient notice of the proceeding and the superior court had immediately before made a determination as to the custody of the child.

FACTS

This case involves a protracted and bitter custody battle over Brendan by his parents Dorothy and Bernard.

In 1982, Dorothy left Bernard in Virginia and came to California with Brendan and her other two children after she had filed charges against Bernard for assault against her and child molesting against the other two children. None of these charges was ever substantiated or proven in court.

Custody alternated between Dorothy and Bernard by means of Dorothy's hiding Brendan in California and Bernard's kidnapping him.

Also, in 1982 Dorothy initiated child custody proceedings in the San Diego Superior Court. Over a protracted period, the San Diego court made visitation orders while the custody battle waged. Dorothy was consistently uncooperative; for 11 months following June 1982, the father and son had

virtually no contact. In October 1983, there was a lengthy, nine-day litigated custody hearing before Judge Kapiloff of the superior court family law division. Judge Kapiloff, after hearing extensive testimony of mental health professionals, social workers and the parents, ordered joint custody to be in both parents with two days per week visitation to Bernard. In the process of that ruling, Judge Kapiloff specifically found there was "no evidence that Brendan was molested by [his father]."

To say the parties did not cooperate with the court order is a gross understatement. There continued to be open warfare between them—the mother determined to impede visitation, the father determined to have it— sometimes angry and out of control. Hearings were held, charges made, considered, acted on. Judge Kapiloff on April 2, 1984, made a formal order for two days a week supervised visitation between father and son. The mother went into hiding with the child. Bench warrants issued. On April 27, the mother turned herself in to the superior court juvenile division, allegedly because Judge Kapiloff was not present in the courthouse that day. Judge Napoleon Jones of the juvenile court recalled the arrest warrants and ordered the mother to appear before Judge Kapiloff on April 30. On that day the mother appeared in court, was reprimanded by the judge and ordered to return for a hearing on May 9, 1984.

On May 3, the parties came before Judge Kapiloff on the father's motion for enforcement and modification of the visitation order. The judge ordered two eight-hour visitations to happen May 5 and 6, 1984. The mother thwarted both these visitations.

The next day, May 4, a dependency petition was filed in the juvenile court regarding Brendan, alleging under Welfare and Institutions Code section 300, subdivision (a), that Brendan had no parent or guardian actually exercising and capable of exercising proper parental care and control. The petition stated "because of said minor's age [he] is in need of such care and control, in that on or about 5-3-84 the emotional atmosphere in the home, to wit, including but not limited to the mother is being forced to allow Brendan to visit his father, [Bernard], who has sexually molested and physically abused Brendan's half sibling [which was] detrimental and harmful to the health and welfare of said minor." The petition also recites: "The mother having custody is requesting the services of the Juvenile Court."

The face of the petition indicates it was mailed on May 7 to various parties, including the father. He contends he never received it. He was handed the petition on May 9. He was present with counsel at the hearing but took no part. The court observed the petition was directed "uniquely" to the mother and made a dependency finding based solely on her admissions on the allegations of the petition. After a very brief hearing and the making

of the dependency finding, the mother's attorney gave a long speech, saying the mother and child were closely bonded, her care was excellent and custody should be placed with her. (This following the mother's admission to allegations of neglect and inability to care for the child.) The court elected to temporarily maintain Brendan's placement in a foster home[1] so as to observe the child's interaction with both parents in a neutral setting. Shortly thereafter, on May 24, because the foster home became unavailable to the child, the court placed Brendan with the mother. "Liberal and ample" supervised visitation was ordered between Bernard and Brendan.

Difficulties with the visitation continued to plague the parties and the courts; these difficulties will not now be discussed since they are not strictly relevant to the issues raised by this appeal. To summarize the situation, since May 4 (date the petition was filed), the father has only seen Brendan on a supervised basis for periods no longer than an hour for a total of 18 visits over a one-year period. Additionally, the heat of the battle and serious difficulties between the parties led Judge Dennis Adams on January 19, 1985, to recuse the entire San Diego bench from further hearing this matter. The case has since been assigned to a retired judge from Los Angeles.

The appeal here is from the juvenile court assumption of jurisdiction. From the pro se brief filed by the father, we distill these serious challenges to the dependency finding: (1) there was inadequate notice of the petition to the father, violating traditional due process guaranties; (2) the circumstances under which the juvenile court succeeded the family court constitutes a transgression of basic rules governing situations of concurrent or overlapping jurisdiction. We have here in fact an unseemly spectacle of a collusive petition being deliberately used to change the forum and to render useless and futile the careful deliberations and great investment of judicial time and effort already expended in a court of coequal jurisdiction.

I

First of all, as stated, the petition was not served on the father until the day of the hearing, a fact respondent Department of Social Services (Department) does not deny. Although there is an indication the Department mailed the petition two days before, that is hardly sufficient time for the petition to reach the father and for him and his attorney to act on it. Moreover, the father denies ever receiving it.

The Welfare and Institutions Code provides where the minor is "detained," as Brendan was here (in a foster home), notice must be given five

---

[1]On May 7, at a hearing before Judge Kapiloff, Dorothy was cited for contempt for failing to allow visitation and Brendan was ordered placed in a foster home.

days before the hearing (§ 337, subd. (b)) and that on the father's request, the court must grant a continuance (§ 322; Cal. Rules of Court, rule 1332).

Furthermore, in addition to these statutory requirements, as a matter of fundamental due process, a parent and his attorney are entitled to such notice of a custody proceeding as provides reasonable opportunity to prepare and be heard in the matter because of the importance of the parental right involved. (See *In re Kelvin M.* (1978) 77 Cal.App.3d 396, 402 [143 Cal.Rptr. 561]; *In re C. P.* (1985) 165 Cal.App.3d 270, 274 [211 Cal.Rptr. 498].)

■ The fundamental and crucial right to "conceive and to raise one's children" is protected by due process guaranties. (*Stanley* v. *Illinois* (1972) 405 U.S. 645, 658 [31 L.Ed.2d 551, 562-563, 92 S.Ct. 1208]; *In re Kelvin M., supra,* 77 Cal.App.3d 396, 400.) "[T]he interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights [citations], [and] the state, before depriving a parent of this interest, must afford him adequate notice and an opportunity to be heard." (*In re B. G.* (1974) 11 Cal.3d 679, 688-689 [114 Cal.Rptr. 444, 523 P.2d 244].) (See also *In re Jeremy C.* (1980) 109 Cal.App.3d 384, 397 [167 Cal.Rptr. 283] ["Notice of the specific facts upon which removal of a child from parental custody is predicated is fundamental to due process"], citing *In re Gault* (1967) 387 U.S. 1, 30-31 [18 L.Ed.2d 527, 547-548, 87 S.Ct. 1428].)

■ Department argues any notice defects were waived because the father and his attorney were at the hearing and neither objected nor requested a continuance.

This precise argument was rejected in *In re C. P., supra,* 165 Cal.App.3d 270, 273, where the appeal court held "*even absent a request for continuance,*" (italics added) it was an abuse of discretion for the court not to grant a continuance of up to seven days under Welfare and Institutions Code section 353 "*to enable [the father's] counsel to acquaint himself with the case.*" (*Id.,* at p. 274.) The father was denied his day in court on the jurisdictional issues. The jurisdictional order was reversed.

Moreover, in the instant case, at the hearing (very brief, encompassing 20 pages of reported transcript), the father and his attorney were treated as nonparticipants. When appearances were first entered, none was entered for either the father or his counsel. The father's attorney (Mr. Koehler) was allowed to briefly comment after the mother's attorney (Ms. Morris) requested placement with the mother. Koehler also attempted to ensure that the record reflected the father denied the petition. The court responded by

stating: "The petition was one where the father can be deemed to deny it. It's a petition that was uniquely geared towards the mother." Later the court remarked since Koehler was new to juvenile court and unfamiliar with its procedures, the court would agree to appointing a cocounsel to assist him. The balance of the hearing consisted of taking the mother's admissions, in the style of a guilty plea prove-up, to establish the allegations of the petition.

Under these circumstances, the failure to object or request a continuance is understandable. The father was treated as a nonparty to the proceeding; and his attorney, unfamiliar with juvenile court procedure and having no notice of the hearing, did not then know the precise steps to be taken. Accordingly, as in *In re C. P., supra,* 165 Cal.App.3d 270, there was no adequate notice of the petition nor meaningful opportunity to be heard.

Finally, the jurisdictional findings made to sustain the petition were based on the admissions of the mother, entirely self-serving under the circumstances; she blatantly used the juvenile court process to avoid the superior court order, saying in her allegations that the basis of her "inability" to care for the child was the earlier order of the family court. Thus the only basis for the juvenile court assumption of jurisdiction was the mother's dissatisfaction with the ruling of another tribunal, which she did not care to obey and had in fact repeatedly disobeyed.

## II

There is a second legal issue posited in these facts. The juvenile court assumed jurisdiction over the precise factual and legal issue just that day resolved in another court. The Department cites cases, contending the "Juvenile Court dependency cases take precedence over and supersede domestic relations actions." Department cites in support of this proposition *In re Syson* (1960) 184 Cal.App.2d 111, 116 [7 Cal.Rptr. 298]; *In re Farley* (1958) 162 Cal.App.2d 474, 478-479 [328 P.2d 230]; *Slevats* v. *Feustal* (1963) 213 Cal.App.2d 113, 117 [28 Cal.Rptr. 517]. Closely examined, none of these cases holds precisely as Department argues, and such is not the law in this or any other jurisdiction. (See Annots., 11 A.L.R. 147; 78 A.L.R. 317; 146 A.L.R. 1153.)

Where there is a conflict, California cases unequivocally endorse the proposition the first court to assume and exercise jurisdiction acquires exclusive jurisdiction. (*Browne* v. *Superior Court* (1940) 16 Cal.2d 593 [107 P.2d 1, 131 A.L.R. 276]; *Simmons* v. *Superior Court* (1950) 96 Cal.App.2d 119 [214 P.2d 844, 19 A.L.R.2d 288].) (See also *Emrich* v. *McNeil* (D.C.Cir. 1942) 126 F.2d 841 [146 A.L.R. 1146], which held the continuing jurisdiction of the divorce court including findings as to child support is exclusive

unless the welfare of the child requires assumption of control by another court; compare *In re William T.* (1985) 172 Cal.App.3d 790 [218 Cal.Rptr. 420].)

Cases are legion which permit assumption of juvenile court jurisdiction over custody issues after there has been a custody ruling in a family law department, but in those cases the *precise matters charged in the juvenile court are different than those resolved by the earlier domestic proceeding.* Most usually, after award of custody to a parent, subsequent events may show the parent is unable to care for the child, thus requiring the state to step in as a party bringing a protective dependency action. For example, in *In re Farley, supra,* 162 Cal.App.2d 474, the court did not hold the juvenile court may relitigate what the domestic relations court has already determined; rather, it declares the mere fact that litigation is pending and a custodial order has been made does not take away the state's power nor prevent its exercise on behalf of the minor. (*Id.,* at pp. 478-479; see also *State* v. *Worthington* (1933) 227 Ala. 204 [149 So. 109].)

However, relitigation of identical issues in both domestic and juvenile forums is nowhere said to be permissible. ■ As the court said in the leading, annotated case of *Cleveland Protestant Orphan Asylum* v. *Soule* (1915) 5 Ohio App. 67, the authority of a juvenile court is necessarily limited to children not already provided for by another court which earlier obtained jurisdiction: "This is but another enunciation of a principle of law that has been recognized from time immemorial, that the court first obtaining jurisdiction of the subject matter retains exclusive jurisdiction and authority until final disposition, free from interference by any other tribunal."

The California Supreme Court in a guardianship petition case, *Greene* v. *Superior Court* (1951) 37 Cal.2d 307 [231 P.2d 821], explained: "The rule making exclusive the jurisdiction first acquired is particularly apposite to prevent unseemly conflict between courts that might arise if they were free to make contradictory custody awards at the same time. [Citations.] Even when one court has appointed a guardian and modification of the right to custody is thereafter sought in the court of another county, it has generally been held in the interests of orderly administration of justice that no other court has jurisdiction in habeas corpus or guardianship proceedings to interfere with the guardian's custody so long as the guardianship continues. [Citations.]

"'The jurisdiction of the court in this respect is a continuing one, and though no motion, petition or other such incidental proceeding may be pending at any particular time, the court still has jurisdiction over the

guardianship. No other court, we believe, has power to interfere with that continuing control over the guardian. . . .' [Citation.]

"We find no reason to hold that the continuing jurisdiction of the divorce court over its custody awards is not also exclusive. 'A decree awarding custody to a parent claiming adversely to the other parent differs only in formal respects from a decree appointing one parent guardian of the person of the child. The effect in either case is to confer upon the party appointed the care and custody of the child.' [Citations.]" (*Id.*, at p. 311.) Such reasoning is most apt where relitigation of the same facts is sought in the juvenile division of the same superior court.

In the recent case of *In re William T., supra,* 172 Cal.App.3d 790, the court was faced with conflicting visitation orders made by a superior court in Stanislaus County (hearing set Aug. 8, order entered Oct. 24) and a juvenile court in Solano County (petition filed Aug. 23, order made Aug. 24). The superior court permitted the mother some visitation, the juvenile court barred any visitation. The father did not permit the mother any visitation and was found in contempt of the superior court's order, the superior court stating it believed the juvenile proceeding to be "strictly an end run play designed to defeat [the superior] Court of jurisdiction." (*Id.*, at p. 794.)

The appellate court, in a split decision, granted the father's petition for a writ of habeas corpus, finding the superior court's visitation order void because the juvenile court's jurisdiction was paramount even though acquired at a later time. (*In re William T., supra,* 172 Cal.App.3d 790, 797.) The court noted although section 304.5 provides "'[t]he fact that a minor is a dependent of the juvenile court . . . shall not divest a superior court . . . from hearing proceedings between two parents regarding the custody of [the] minor,'" (*id.*, at p. 804) it concluded "concurrent jurisdiction does not make the jurisdiction coequal. The custody court may not seek to enforce custody orders which conflict or interfere with orders properly issued by the juvenile court. [Citations.] Such conflicting orders are void and a party may not be held in contempt for disobeying such orders." (*Id.*, at p. 800.)

The *William T.* court was presented with a factual situation different from the case at bar. In *In re William T., supra,* 172 Cal.App.3d 790, the juvenile court assumed jurisdiction and made its visitation order before the superior court had a hearing and issued its order. Moreover, the *William T.* court expressly refused to consider whether the superior court had made prior determinations on issues before the juvenile court (e.g., the mother's alleged physical and sexual abuse of the child) because it found the issues of res

judicata and collateral estoppel had not been properly raised. The court further found there was not an identity of issues in the two proceedings. (*Id.,* at p. 802.)

Finally, the *William T.* court based its decision on public policy concerns not present in the instant case. The court stated: "The policy behind the exception [that juvenile court jurisdiction is paramount even when another court first assumed jurisdiction] is clear, and the purpose understandable. The state, acting through the juvenile court under the theory of *parens patriae,* seeks to protect the child or the community. In dependency proceedings, a private party does not invoke the jurisdiction of the juvenile court. A probation officer or social worker, through the services of child abuse or protection agencies, determines whether proceedings in the juvenile court are warranted, and the filing of a petition is preceded by an investigation to determine if there is cause to commence such proceedings. (§§ 325-329.) These processes insulate the proceedings from self-interest and petty interferences which can pervade parental custody disputes." (*Id.,* at p. 798.)

In contrast, in the case at bar, the facts indicate the petition was prompted by the mother and it can hardly be said the juvenile court proceedings were insulated from pervasive "self-interest and petty interferences [characteristic of] parental custody disputes."

The California cases cited by Department in support of the assertion that concurrent jurisdiction of domestic and juvenile court may be appropriate rely on *Dupes* v. *Superior Court* (1917) 176 Cal. 440 [168 P. 888], and progeny. The *Dupes* case did not involve relitigation of issues.[2] Rather, a later-brought juvenile petition was based upon allegations of misconduct of the custodial parent. The question presented was whether the mere fact the superior court had made a custody order deprived the juvenile court of any jurisdiction over the minors. The *Dupes* court pointed out different parties and different considerations are normally involved in these types of actions and the *Dupes* court held there is no necessary ouster of jurisdiction based on the "mere fact that a litigation is pending between the parents and that an order regarding the custody of the children has been made therein." (*Id.,* at pp. 441-442.) The court expressly declined to consider the possible contingency of a conflict between the two courts, saying that issue was not present there, and "we must assume that, whatever eventually may be the

---

[2]The court said in *Dupes* v. *Superior Court, supra,* 176 Cal. 440, 442: "In passing upon the question regarding the fitness or unfitness of the mother, *the court will be aided by evidence of her conduct in the past,* and it will make no difference if exactly such evidence may have been adduced in some other action in which the parties and the issues were not the same as in the proceeding inaugurated by the uncle of the minors."

order of the 'Juvenile Court,' *it will be so drawn that it will not conflict with the judgment in the action between the parents.*" (*Id.*, at p. 442, italics added.)

■ In the case at bench, not only does the juvenile court order conflict with the superior court order but the sole justification for invoking the juvenile court's jurisdiction was dissatisfaction with the superior court order. This thorny bramble patch we need not enter. We confront here at the outset a violation of the fair hearing concept detailed in discussion I above. The proceedings were deprived of elementary fairness so as to preclude an enforceable order affecting the rights of the father vis-à-vis the child. The procedure followed by the juvenile court was fundamentally defective, void from the beginning, and cannot be upheld. (*In re B. G., supra,* 11 Cal.3d 679, 688 (jurisdictional defects are "fatal" to the proceeding); *In re Jeremy C., supra,* 109 Cal.App.3d 384, 398 (reversal as to both the jurisdictional and disposition order); *In re C. P., supra,* 165 Cal.App.3d 270 (reversal of jurisdictional order).

The order is reversed.

Wiener, J., and Work, J., concurred.

A petition for a rehearing was denied April 18, 1986, and respondent's petition for review by the Supreme Court was denied June 20, 1986.